═══════════

ULSEN v. COOK INLET COAL FIELDS CO.

(Circuit Court of Appeals, Ninth Circuit. March 3, 1903.)

No. 861.

1. SERVANT'S PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Evidence in an action by a trainman for injuries from the derailing of a train examined, and *held* to require the submission of the question of contributory negligence in riding between the engine and first car to the jury.

**2. Same—Consideration of Actual Event.**

It is error to measure and determine the question of contributory negligence solely by what actually happened.

In Error to the District Court of the United States for the District of Alaska, Division No. 1.

W. E. Crews, T. R. Lyons, and Lorenzo S. B. Sawyer, for plaintiff in error.

Oscar Foote, R. W. Jennings, and Chickering & Gregory, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.   This was an action for damages for personal injuries sustained by the plaintiff in error, who was plaintiff in the court below, while working for the defendant to the action on a railroad it was constructing from a point in Alaska, called "Homer," to its coal mines, distant about seven miles.   The road was being built to carry coal from the mines to the ocean.   The motive power was a 10-ton engine, which, together with two flat cars, constituted the train on which the plaintiff was riding at the time he was injured. The plaintiff, with other employés, was sent to Homer by the defendant company with its master mechanic, one Starkey, for the purpose of constructing the road, and at the time of the accident had been so engaged about two months.   For the first three days he helped Starkey set up the engine, and was then put to work with the grading crew.   The character and condition of the road at the time of the accident, so far as then constructed, are indicated by this extract from Starkey's testimony:

"Q. State to the jury the character of the rails that were used on that roadbed—the kind, and character, and condition. A. We had all sorts of rails. Had thirty-pound rails, and thirty-five-pound, and some forty-pound. The forty-pound rails were thrown out—there was about seven or eight of them—and left at the spit at Homer. They got the road built about two and a half miles, and run out of rails, and, to get it along a little further, waiting for a boat to bring some more, they straightened these forty-pound rails out, and laid them down temporarily on every other tie or two, with the intention of taking up those rails as soon as the boat came in; and, instead of taking them up, when they received the others, they were left there. Q. State whether or not you ever notified the officers of the corporation of the condition of those rails. A. We talked it over, yes, sir; and every time we would pass over them—Mr. Ray (who was the president and general manager of the road), or any of them—they would make the remark that it was a bad piece of road, and it ought to be fixed. Q. State the character of the rails as to being new or secondhand rails. A. The first three miles of road was secondhand rails, and the rest of them was new ones. Q. State where this accident occurred, with relation to that road, as to the point you speak of. A. Occurred about two and a half miles from Homer. Q. There where the defective rails were? A. Yes, sir. They were only half tied—every other one. Q. I'll ask you to state the kind and character of the cars—whether box or flat cars, or what. A. The trucks were shipped from Seattle, and the bodies of the cars were made up there—put together. Q. What were they, new or old trucks? A. Generally old trucks. Q. Secondhand, were they? A. Trucks that they used to use in Seattle on the old horse-car lines. Q. State what condition they were in as to the flanges. A. They were in bad shape; yes, sir. Q. Mr. Starkey, you have stated the platforms were up there. Were there any springs under them? A. They had one or two cars

with springs and one or two or three without. Q. Was there any standards on the sides of the cars, sticking up from the sides to keep the rails from falling out? A. No, sir."

There was evidence, without conflict, to the effect that prior to the accident the train had jumped the track many times; one of the witnesses saying as many as 50 times. When the accident occurred, the then rear car was fastened to the engine by a bar, called a "draw" or "Johnson" bar, described by Starkey as a "thirty-pound rail flattened at each end, with a hole in each end." During the morning of the day of the accident the plaintiff was sent from the grading crew to help load and unload some rails. Starkey was the engineer of the locomotive, and had charge of the train. After loading, the rails were taken up about five miles to the end of the track and unloaded, after which the train was run back, and, after backing for about two miles, and while going about six miles an hour, the cars jumped the track. One toppled over on its side; the other swung around, breaking the Johnson bar, which caught and broke the leg of the plaintiff, who was sitting on the engine, and between it and the first car.

Upon the conclusion of the evidence the court below, on motion of the defendant, directed the jury to return a verdict for the defendant, which was accordingly done; the court being of the opinion that, notwithstanding the evidence tended to show, and, in the expressed opinion of the court, did in fact show, negligence on the part of the defendant, it also showed that the plaintiff was guilty of contributory negligence in sitting where he did, and therefore that he could not recover. Starkey testified that he was in charge of the construction of the road, and of the train in question, that no orders of any character or from any source were given as to where on the train the employés or others should ride, and that "they could ride anywhere they could get on." Starkey further testified that "the only safe place to ride on the train would have been in the cab of the locomotive," but that it was not possible for the plaintiff to have ridden in the cab on the occasion in question because "the seats were all full." He further testified, in answer to the question whether the plaintiff's position on the train was "ordinarily safe or unsafe," and whether it "increased the hazard," that "the way the equipments were and the cars were handled, why that was as safe as any place on the train. In fact, if he was sitting on the side of the car next to where the brakeman was, and the car turned over, why I don't know what would have happened." The plaintiff also testified that the position he took was as safe as any place on the train, except on the inside of the cab, where he could not go, because it was full.

In view of the condition of the road, the character of the train, the method of its operation, and the testimony mentioned, the question of contributory negligence was, in our opinion, plainly one for the jury. The error into which the learned judge of the court below fell may be seen from this excerpt from his views, expressed in ruling upon the motion:

"Now, in this case we find a man riding between the engine and the two cars, as the engine was backing with the cars toward Homer; and the witness Starkey says that was as safe a place, and Olsen (plaintiff) also states it was as safe a place, as anywhere on that train. That cannot be true. Why? Because what occurred in this instance proves that it cannot be true. Had this man been on the cars— One of them turned up on one side so the wheels were in the air, to be sure, but, if he had been sitting on this car, he simply would have been thrown off. If the train were going but six miles an hour, he would in all probability not have been injured. The only danger was in the car turning over on him, and even that might not have been fatal. But in the view of this evidence, can any reasonable man say that a man would not have been safer on those flat cars in most any position than between the cars and the engine? Counsel urges that this man was not located at the front end of the cars, the real place of danger. That is true. But under the testimony here, and the showing made, was it not safer, even on the front end of the cars, than between the cars anywhere?"

From this it will be seen that the court measured and determined the question of contributory negligence by what actually happened.

For the error committed in the respect indicated, the judgment must be reversed, and the cause remanded for a new trial. It is so ordered.